IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDRE L. WATKINS,                *

       Plaintiff,             *

                                      Civil Action No. RDB-20-0681

       v.                   *

UNITED NEEDS & ABILITIES,     *
INC.,
                              *

       Defendant.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiff Andre L. Watkins ("Watkins" or "Plaintiff") brought this action against Defendant United Needs & Abilities Inc. ("UNA" or "Defendant") alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. § 3-401, *et seq.* ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* ("MWPCL").[1] Presently pending is the Defendant's Motion for Summary Judgment (ECF No. 24). The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, the Defendant's Motion for Summary Judgment (ECF No. 24) is GRANTED. The Plaintiff's federal and state law claims fail as a matter of law as his time spent "waiting to be engaged," or alternatively "sleep time," is not compensable under either federal or state law.

## BACKGROUND

---

[1] This Court has federal question jurisdiction over the Plaintiff's FLSA claim pursuant to 28 U.S.C. § 1331 and will exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

In ruling on the pending motion for summary judgment, the Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). Defendant UNA is a designated 501(c)(3) charitable organization which serves individuals with developmental disabilities in all nine counties of Maryland's Eastern Shore. (ECF No. 24-1 at 1.) UNA provides residential, financial, vocational, educational, and recreational assistance to disabled individuals. (*Id.*) Around February 13, 2017, Plaintiff Watkins, a resident of Dorchester County, Maryland, was hired by Defendant UNA to work as a Residential Aide for the facility located at 104 Coulbourn Mill Road in Salisbury, Wicomico County, Maryland. (ECF No. 1 ¶¶ 1, 9; Dep. Andre Watkins, ECF No. 24-2 at 10.) This was not Watkins' first job in the residential care industry: Watkins had six years of experience working for a similar organization, Delmarva Community Services, where he was employed from 2005 to 2008 and again from 2013 to 2016. (ECF No. 24-2 at 17:19-18:6.)

During his first week with UNA, Watkins attended an orientation program during which he asserts he received a copy of the UNA employee handbook. (*Id.* at 12:19-22.) During that orientation, Watkins admits that he did not inquire about any particular policies and was not assigned to any specific shifts or work. (*Id.* at 12:9-14, 12:20.) When Watkins was hired, he understood that he would be paid at an hourly rate of $11.00 per hour and that he would receive paychecks every second Friday of each two-week pay period. (*Id.* at 10:7-12, 15:2-5.)

On or about May 15, 2017, Watkins was promoted to "House Manager" at the Coulbourn Mill facility, and his pay was increased to $12.29 per hour. (*Id.* at 10:7-12.) The Coulbourn Mill facility was a single-family house, which for most of the time Watkins worked

there had two residents: Louis and Jack. (*Id.* at 53:6-11, 56:2-7.) Louis was reportedly more independent, but Jack required assistance with nearly all daily activities. (*Id.* at 78:19-79:1, 80:13-81:6.) Watkins worked primarily with Louis, but overall care of the two clients from Monday to Friday was provided by Watkins and two other staff members: Daniel Coles ("Coles") and Mark Savage ("Savage"). (*Id.* at 56:9-12; 57:13-14; 63:18-64:2.)

As House Manager, Watkins was scheduled for 39 hours of work each week. (*Id.* at 31:17-32:9.) Each week Watkins would begin working at 4:00 p.m. Monday afternoon. (*Id.* at 31:19-20.) At that time, Watkins would arrive at the facility and clock-in using a pass code entered via telephone call to a 1-800 number. (*Id.* at 59:21-60:5.) When he was done for the night around 11:00 p.m., he would clock out by calling the same number. (*Id.* at 31:19-20.) At that time, Savage, the designated "awake overnight" staff member, would clock in. (*Id.* at 57:13-14, 63:18-64:2.)

During the overnight period, Watkins could not leave the facility. (ECF No. 1 ¶ 11.) He was provided with a private bedroom with a television and cable and a separate private bathroom. (ECF No. 24-2 at 64:19-65:14.) Between the hours of 11:00 p.m. and 6:00 a.m., Watkins was free to sleep, watch TV, play video games, shower, talk on the phone, attend to personal activities, and fix his own meals. (*Id.* at 66:4-67:3.) At 6:00 a.m. Tuesday morning, Watkins would clock back in and clock out again at 8:30 a.m., and he would then repeat roughly the same pattern starting at 4:00 p.m. Tuesday afternoon through Friday morning. (*Id.* at 61:21-13.) On Fridays, Watkins worked from 6:00 a.m. to 8:30 a.m., and once he clocked out at 8:30 a.m., he would be done with work until Monday and was free to leave the premises until his Monday shift began. (*Id.* at 32:6-9.)

Watkins was aware that as House Manager, he would be required to remain at the Coulbourn Mill house overnight four nights a week. (*Id.* at 64:3-15; ECF No. 1 ¶ 11.) He was also advised that he would not be paid for the hours between 11:00 p.m. and when he began his shift the next morning. (ECF No. 1 ¶ 11.) This was mostly true with some rare exceptions: if his primary client, Louis, needed assistance during the night, Savage would allegedly wake Watkins if he could not handle an overnight problem on his own. (Savage Affidavit, ECF No. 25-3 ¶ 15.) Watkins was informed that he could be paid for this time worked during the night. (Dep. Ronald Thorpe, ECF No. 24-3 at 45:9-16.) Watkins' supervisor from February 2018 to May 2019, Ronald Thorpe, explained:

> [Watkins] was told that he could get paid for that. So if he worked with Louis for an hour he could get paid for an hour, but he would have to punch in and punch out. But if he didn't have to work with Louis, and Louis didn't wake up or anything, he was punching back in, I believe 6 a.m. in the morning, helping get Louis together and get him ready for the next day.

(*Id.* at 45:9-16.) In twenty-seven of the fifty-nine two-week payroll periods falling between February 24, 2017 and May 31, 2019, Watkins received some amounts of overtime pay. (ECF No. 24-6.) Time keeping records show that Watkins was earning some amount of overtime pay during the overnight shift approximately 15% of the time. (ECF No. 28-1.) However, it remains undisputed that Watkins was not generally compensated for his free time and sleeping time during the Monday to Friday workweek.

In April of 2019, Watkins traveled with Louis and other UNA staff members and clients on a five-day group trip to North Carolina. (ECF No. 24-2 at 34:22-35:8.) According to Watkins, he was asked to accompany Louis on this trip by his director Whitney Tilghman

("Tilghman").[2]  (*Id.* at 36:22-37:20.)  While on the trip, Watkins was tasked with ensuring that

Louis received his medications and participated in trip activities.  (*Id.*)  He claims that he was

not told how he would be compensated for this trip prior to his arrival in North Carolina.  (*Id.*

at 45:17-47:6.)

Upon his arrival in North Carolina, Watkins alleges that the was told to read and sign

a form related to his compensation for the trip.  (*Id.* at 39:3-13.)  The form included a statement

and a space for his signature.  (ECF No. 25-4.)  The statement read:

> I have freely volunteered to participate in the United Needs & Abilities' Outer
> Banks trip from Monday, April 8 through Friday April 12, 2019.  During the
> trip, I will work as needed to ensure that I will receive free meals, lodging, and
> amenities during the trip and that I will have the opportunity for free time as
> well.  Because this trip is a work experience and a personal benefit to me, I agree
> that I will receive 40 hours of regular pay and no overtime pay for the trip.

(*Id.*)  Watkins signed the form without asking any questions or raising any concerns.  (ECF

No. 24-2 at 45:17-47:6.)  During the trip, Watkins participated in the group activities including

shopping, shooting pool, and playing games.  (*Id.* at 40:2-13.)  Watkins was also provided

meals.  (*Id.* at 44:19-45:1.)  He shared a room with Louis, and after Louis went to sleep, he was

free to watch movies, play pool and ping-pong, and other activities.  (*Id.* at 40:14-42:4.)

Watkins left his position at UNA sometime in May of 2019.  (*Id.* at 10:5-6.)  About a

month prior to his departure, he was demoted from the House Manager position for reasons

related to an alleged failure to order medication.  (*Id.* at 68:16-69:2.)  Watkins left UNA hoping

to make use of a commercial driver's license he had obtained through training programs he

attended on weekends while working at UNA.  (*Id.* at 69:14-19.)  He ultimately began working

---

[2] In the Complaint, Plaintiff Watkins alleges that this trip was mandatory.  (ECF No. 1 ¶¶ 13-14.)  However, his deposition
testimony clearly provides that Tilghman asked whether Watkins would mind going on the trip to which Watkins
responded he did not have a problem with it.  (ECF No. 24-2 at 45:17-47:6.)

for a concrete company based on an application he submitted in February or March of 2019. (*Id.* at 71:16-19.)

As noted above, from February 2018 to May 2019, Watkins' direct supervisor was Thorpe. (*Id.* 19:12-16, 23:21-24-3.) Thorpe was Watkins' friend of nearly thirty years and had over two decades of experience in the residential care industry. (ECF No. 24-3 at 13:16-21.) He worked at Delmarva Community Services for about twenty years. (*Id.*) Watkins' mother had been the Chief Operating Officer at Delmarva, and as also noted above, Watkins himself worked at Delmarva from 2005 to 2008 and 2013 to 2016, prior to joining UNA. (ECF No. 24-2 at 17:19-18:6.)

Thorpe explained in his deposition that hours worked by staff at UNA, such as Watkins, were logged by the employee calling in at the beginning of each shift. (ECF No. 24-3 at 27:14-28:5.) Thorpe alleged that he could assist Watkins and other employees he supervised with keeping hours correctly logged if, for example, they were having trouble with the call-in-entry process. (*Id.* at 28:6-30:14.) Thorpe could correct the clocked times when he was in the office. (*Id.* at 30:3-14.) The payroll system was known as "MITC," and it was known to have frequent problems. (*Id.* at 66:14-16.) Thorpe also explained how Watkins would sometimes work during the overnight shifts: if Louis woke up or had some sort of incident, Watkins could assist him and be paid for the extra work by punching in and out during the night. (*Id.* at 44:18-45:20.)

After Watkins' trip to North Carolina, Watkins and Thorpe reportedly had a conversation about a potential wage claim against UNA based on information Thorpe had

received from someone named Gary at Delmarva.[3]  (ECF No. 24-2 at 22:1-23:20.)  After Watkins left UNA, he filed a claim against the company with the State of Maryland's Department of Labor, Licensing and Regulation ("DLLR") using pay stubs provided by Thorpe.  (*Id.* at 25:21-27:5, 29:9-30:1.)  The DLLR complaint noted Watkins' concerns regarding compensation he might be owed "some kind of way" for overnight time after he clocked out and before he clocked back in.  (*Id.* at 30:18-31:10.)  Thorpe also ultimately filed a claim against UNA in the DLLR upon his own departure from UNA, claiming that he was on-call twenty-four hours a day as the Program Coordinator.  (ECF No. 24-3 at 24:21-25:19.) He eventually decided to leave the claim "alone."  (*Id.*)  Neither Watkins nor Thorpe contend that they ever complained about their compensation during their employment with UNA. (ECF No. 24-2 at 30:2-6, 33:14-17; ECF No. 24-3 at 20:8-21.)  Thorpe only alleges that he discussed the issue with Whitney Tilghman in the lunchroom on one occasion.  (ECF No. 24-3 at 20:22-21:1.)

Tilghman is an Associate Director for UNA.  (Dep. Whitney Tilghman, ECF No. 24-4 at 7:8-14.)  Tilghman knew both Watkins and Thorpe while serving in her previous position as UNA's Program Director.  (*Id.* at 7:17-22.)  She does not recall discussing whether staff employed by UNA should be paid differently with Thorpe.  (*Id.* at 13.)

Mike Dyer ("Dyer") is the Chief Executive Officer of UNA.  (Dep. Mike Dyer, ECF No. 24-5 at 4:8-15.)  According to Dyer, Coulbourn Mill is one UNA's group homes and is regulated by the State of Maryland's Developmental Disabilities Administration ("DDA").  (*Id.*

---

[3] Watkins appears to allege that in this conversation he complained to Thorpe, his supervisor, about UNA's failure to compensate for all hours worked.  (ECF No. 25 ¶ 8.)  However, his deposition testimony clearly provides that Thorpe was the one who told Watkins that he should "look into what was going on, was it legal or not."  (ECF No. 24-2 at 22:5-8.) Watkins also clearly confirmed that he did not ever raise concerns about his pay prior to leaving UNA.  (*Id.* at 30:2-6.)

at 6:17-7:4.)  Dyer sought counsel of an attorney on UNA's pay practices in 2014 or 2015.  (*Id.* at 17:12-19, 18:14-16.)  UNA's sleep policy[4] was then set as follows:

> In houses where we have staff who must remain on site overnight we have a policy where the schedule goes for five successive days and/or nights where that person should be there at the house for 8 hours, freedom for 8 hours.  So they work 8 hours, sleep 8 hours, and have freedom for 8 hours five days and nights, and then they have a relief person that comes in for two nights.

(*Id.* at 27:4-18.)  Dyer asserted that the Coulbourn Mill facility's policies varied slightly from this general policy due to the presence of overnight staff.  (*Id.* at 27:19-28:5.)  Staff members like Watkins "would have the freedom to leave during the night if they wanted" because Coulbourn Mill had "awake overnight staff."  (*Id.*)

Dyer confirmed that hourly employees were responsible for clocking their own time worked, as well as explained the contents of the document signed by Watkins related to his pay for the North Carolina trip.  (*Id.* at 53:15-54:19, 68:12-69:3.)  According to Dyer, "everybody went on the trip voluntarily," including staff members.  (*Id.*)  Those that did so went with the "understanding that it was going to be some work, some fun, and they'd be paid for 40 hours."  (*Id.*)

Approximately ten months after Watkins voluntarily terminated his employment, on March 13, 2020, he filed a three-count complaint against Defendant UNA alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. § 3-401, *et seq.* ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* ("MWPCL").

---

[4] In discovery, Defendant UNA produced a document purporting to represent a written sleep time policy, as well as an email dated March 17, 2021 enclosing that document.  (ECF No. 27.)  However, no copy of such document with Plaintiff Watkins' signature has been produced.

(ECF No. 1.)  After months of discovery, Defendant UNA filed the presently pending Motion for Summary Judgment.  (ECF No. 24.)  The Plaintiff opposes the Defendant's Motion.  (ECF Nos. 25, 27.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial.  *Id.* at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).  In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).

## ANALYSIS

The gravamen of the Plaintiff's claims in this case is that he is entitled to pay for "all hours worked," including those hours that he was required to remain on the Coulbourn Mill premises when he was not clocked in, as well as all the time spent on the North Carolina trip. However, for the same reasons set forth by this Court in *Clayton v. Delmarva Community Services, Inc.*, 447 F. Supp. 3d 404 (D. Md. 2020) (Bennett, J.), *appeal dismissed*, No. 20-1482, 2020 WL 6162635 (4th Cir. June 9, 2020), the Plaintiff's claims are without merit. In *Clayton*, employees working in independent living residential facilities filed suit against their employers, arguing that they should be compensated for time spent sleeping at their assigned individual living residential facilities under the FLSA, MWHL, and MWPCL. This Court entered judgment in favor of the defendants, holding that the plaintiffs' claims were barred by the statute of limitations, but also that their claims would fail as a matter of law, as their "sleep time" was not compensable under state or federal law. *Id.* at 406. In this case, the time Watkins spent sleeping or enjoying free time both on the Coulbourn Mill premises and the North Carolina trip are not compensable under federal or state law.

## I.    Fair Labor Standards Act – Count One

Under the Fair Labor Standards Act ("FLSA"), employers are required to compensate employees for all of their hours worked, at a rate that is not less than the federal minimum wage rate. 29 U.S.C. § 206. Additionally, the FLSA provides that employers must compensate employees "at a rate not less than one and one-half times" the employee's regular hourly rate for any time the employee is required to work in excess of a forty-hour workweek. 29 U.S.C. § 207. There is no factual dispute as to whether Watkins was compensated for time spent sleeping or enjoying free time on the Coulbourn Mill premises, or that he received only forty

hours of pay for his time on the North Carolina trip. The question at issue in this case is one of law, namely, whether Watkins' sleeping time and free time should be considered working time under the FLSA.

As this Court thoroughly explained in *Clayton*, to determine what time is considered working time under the FLSA, the United States Supreme Court stated in *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944), that employees must be compensated if they are "engaged to wait," however, an employer is not required to pay an employee who is merely "waiting to be engaged." 447 F. Supp. 3d at 412 (citing 29 C.F.R. § 785.14 (quoting *Skidmore*, 323 U.S. at 137)); *see also Myers v. Baltimore County, Maryland*, 50 Fed. App'x 583, 587 (4th Cir. Oct. 7, 2002); *Kelly v. Hines-Rinaldi Funeral Home, Inc.*, 847 F.2d 147, 148 (4th Cir. 1988). Federal regulations implemented by the United States Department of Labor ("DOL") are used to distinguish between time spent "engaged to wait" and "waiting to be engaged." [5] *See* 29 C.F.R. § 785. Under 29 C.F.R. § 785.14, "waiting time" is compensable if it is time spent "engaged to wait." *See Skidmore*, 323 U.S. at 137. This determination "depends upon particular circumstances," such as the "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances." 29 C.F.R. § 785.14 (quoting *Skidmore*, 323 U.S. at 137).

Defendant UNA contends that Watkins was merely "waiting to be engaged" rather than "engaged to wait" during his scheduled overnight sleep/free time hours at the Coulbourn

---

[5] The regulations instruct that the "ultimate decision on interpretations of the act are made by the courts," and "thus provide a 'practical guide for employers and employees as to how the office representing the public interest in its enforcement will seek to apply it.'" 29 C.F.R. § 785.2.

Mill faciltity and for portions of the North Carolina trip. (ECF No. 24-1 at 14.) To determine

if such waiting time is compensable under the FLSA, the critical question is whether "the time

is spent predominantly for the employer's benefit or the employee's." *Armour & Co. v.*

*Wantock*, 323 U.S. 126, 133 (1944) (instructing that the answer depends on all the

circumstances of each case); *Roy v. Cnty. of Lexington, S.C.*, 141 F.3d 533, 544 (4th Cir. 1998)

(citing *Armour & Co.*, 323 U.S. at 133). In making such a determination, this Court considers:

> the agreement of the parties, the nature and frequency of the services provided
> in relation to the time spent waiting, where the plaintiff is waiting, whether the
> employee may carry a beeper or leave home, the employee's ability to switch
> on-call shifts, and whether the employee actually engaged in personal activities
> during on-call time.

*See Clayton*, 447 F. Supp. 3d at 414 (citing 29 C.F.R. § 785.14 (quoting *Skidmore*, 323 U.S. at

136-37); *see also Kelly*, 847 F.2d at 148; *Whitten v. City of Easley*, 62 F. App'x 477, 479 (4th Cir.

2003); *Myers*, 50 F. App'x at 587; *Marroquin v. Canales*, 505 F. Supp. 2d 283, 295 (D. Md. 2007).

As this Court has explained:

> "[T]he test is not whether the employee has substantially the same flexibility or
> freedom [she] would have if not on call." *Whitten*, 62 F. App'x at 480 (quoting
> *Ingram v. Cnty. Of Bucks*, 144 F.3d 265, 269 (3d Cir. 1998)). Rather, the relevant
> inquiry is "whether [employees] may actually engage in personal activities during
> on call shifts." *Id.* (quoting *Berry v. Cnty. of Sonoma*, 30 F.3d 1174, 1184-85 (9th
> Cir. 1994)); *Myers*, 50 F. App'x at 587. This issue may be answered as a matter
> of law, *Kelly*, 847 F.2d at 148, or if the facts are unclear, may be answered at trial,
> *Marroquin*, 505 F. Supp. 2d at 295.

*Id.*

The Defendant asserts that on this matter, this case "is on four corners with the facts

in *Clayton*." (ECF No. 24-1 at 14.) In *Clayton*, the undisputed record provided that the

plaintiffs would clock out at night and remain on their employers' premises and "either slept,

watched television, read, or engaged in other personal activities." *Id.* Those plaintiffs were

instructed that if they were "awakened by a resident during [that] time," they should "clock back in while attending to the situation in order to be paid for the time spent working." *Id.* However, the Plaintiffs testified that they were "only infrequently" awakened to assist residents during the night. *Id.* Based upon the United States Court of Appeals for the Fourth Circuit's decision in *Myers v. Baltimore County, Maryland*, 50 F. App'x 583 (4th Cir. Oct. 7, 2002), this Court held that despite the fact that the plaintiffs were required to remain on the premises overnight, their sleeping time was not compensable. *Id.* at 414-415. In *Myers*, the Fourth Circuit "concluded that eating, sleeping, and watching television at night are just the types of personal activities that constitute 'uninterrupted personal pursuits.'" *Id.* (quoting *Myers*, 50 F. App'x at 587). The Court then held that "caretakers" required to live at a residential park twenty-four hours per day in order to respond to infrequent emergencies were not entitled to compensation for such "uninterrupted personal pursuits," and there was "no indication that interruptions of private pursuits were frequent enough to render such work time, that is, time spent predominantly for the benefit of [the employer]." *Myers*, 50 F. App'x at 587.

The Fourth Circuit and this Court have held that a variety of similar working arrangements where employees are essentially "on call" but allowed to participate in personal activities are simply examples of individuals "waiting to be engaged," rather than "engaged to wait." In *Whitten v. City of Easley*, the Fourth Circuit held that firefighters who worked twenty-four shifts, then spent forty-eight hours on call were not entitled to pay for all of the on-call time. 62 F. App'x at 479. The firefighters were free to pursue personal activities, drink, and travel, and on average, responded to four calls while on call each month. *Id.* In *Kelly v. Hines-Binadli Funeral Home, Inc.*, a funeral home employee, who lived rent-free on the premises of the

funeral home, was required to stay on the premises during night hours six days a week. 847 F.2d at 147-48. He was told to answer telephone calls at any hour and pick up corpses as needed. *Id.* This task kept him confined to his apartment after regular business hours, but given that he only responded to a few phone calls and only had to pick up a couple corpses each month, while enjoying free living accommodations, the Fourth Circuit held he was not entitled to on-call pay. *Id.* Similarly, in *Skrzecz v. Gibson Island Corp.*, this Court held that an emergency medical worker in a private, gated community in Maryland should not be compensated for time spent on call at night. No. RDB-13-1796, 2014 WL 3400614, *8-*10 (D. Md. July 11, 2014). In that case, the plaintiff was provided living accommodations and was required to stay in or near her home on Gibson Island during on-call hours, was not permitted to drink alcohol, and was generally required to be ready to respond to emergency and non-emergency calls. *Id.* at *8. During her on-call hours, the plaintiff reported that she would eat, sleep, watch television, and spend time with her son. *Id.*

In this case, Watkins acknowledges that his job description included remaining on the Coulbourn Mill facility premises from Monday afternoon through Friday morning. (ECF No. 24-2 at 64:8-15.) As in *Clayton*, *Kelly*, and *Skrzecz* and other cases, Watkins was provided with a private place to stay overnight. (*Id.*) Watkins' friend and supervisor, Thorpe, testified that Watkins would have been compensated for any hours worked during his free time if clocked in and out appropriately. (ECF No. 24-3 at 45:9-16.) Watkins does not claim that he frequently had to work during the night. Additionally, in this case, unlike in *Clayton*, Watkins' facility employed an "awake overnight" staff person. Savage, as Watkins acknowledges, was the Coulbourn Mill facility's "awake overnight" staff member: he clocked in 11:00 p.m., and

he stayed awake until 7:00 a.m. in case something happened to one of the residents. (ECF No. 24-2 at 90:17-91:2.) Savage was reportedly primarily tasked with assisting Jack, the resident with greater need of assistance, and could awaken Watkins if Louis also required overnight care. (*Id.* at 91-92; ECF No. 25-3 ¶ 15.) However, again, Watkins could be compensated for any time actually worked during the overnight hours. Such work occurred only about 15% of the time Watkins stayed on the premises overnight. (ECF No. 28-1.)

With respect to the North Carolina trip, Watkins' tasks included providing Louis with his medication and ensuring he participated in group activities. (ECF No. 24-2 at 36:22-37:20.) Watkins was otherwise free to also participate in group activities, received free meals and lodging, and could enjoy activities like shooting pool, watching movies, and playing ping pong once Louis went to bed each night. (*Id.* at 40:14-42:4.) While the location and schedule were different on this trip, Watkins' role was seemingly the same as during a typical week: he was tasked with assisting Louis throughout the day, but also had free time to use as he wished.

The Plaintiff's sole attempt to distinguish his case from the case in *Clayton* is to suggest that it was unclear whether Watkins was able to leave the Coulbourn Mill facility premises at night during his typical Monday to Friday shift. (ECF No. 25 at 20.) According to the Plaintiff, he, Savage, and Thorpe were all under the impression that Watkins was required to remain on the premises overnight. (*Id.* at 20-21.) Meanwhile, Dyer said that he was not so required due to the presence of an awake overnight staff member. (*Id.*) Yet, as this Court explicitly stated in *Clayton*, "the relevant inquiry is *not* whether [a plaintiff] had the freedom to leave, but whether they had freedom to engage in personal activities" during the overnight period. 447 F. Supp. 3d at 414 (emphasis added) (citing *Whitten*, 62 App'x at 480). This Court and the

Fourth Circuit have consistently held that even when an individual is required to remain on call overnight in a particular location, such time is not necessarily compensable. *See id.*; *see also Kelly*, 847 F.2d at 148; *Myers*, 50 F. App'x at 587; *Skrzecz*, 2014 WL 3400614, at *8. Plaintiff Watkins has not and cannot distinguish the facts of this case from those at issue in *Clayton*. Considering all of the circumstances and nature of Watkins' employment, this Court finds that, as a matter of law, Plaintiff's overnight time at the Coulbourn Mill facility was time during which he was waiting to be engaged—time that was not compensable under the FLSA. For the same reasons, this Court also finds that free time on the North Carolina trip was similarly not compensable, as Watkins was free to engage in activities in the same manner as during his typical Monday to Friday workweek.

Additionally and alternatively, the overnight time Watkins spent at Coulbourn and free time on the North Carolina trip may be considered "sleep time," which is also not compensable under the FLSA. Under 29 C.F.R. § 785.23, "[a]n employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises." Accordingly, an employer need not compensate an employee for time when an employee "may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own." 29 C.F.R. § 785.23; *See also Myers*, 50 F. App'x at 587 (citing 29 C.F.R. § 785.23). When an employee resides on the employer's premises, there is a presumption that he or she is not working the entire time on the premises. *Id.* "[A]ny reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted." 29 C.F.R. § 785.23. "Ultimately, an agreement

reached pursuant to section 785.23 is binding if it is reasonable in light of 'all of the pertinent facts' of the employment relationship." *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 199 (4th Cir. 2005) (quoting *Leever v. City of Carson*, 360 F.3d 1014, 1018 (9th Cir. 2004)).

As the party seeking the benefit of Section 785.23, the Defendant UNA bears the burden of establishing its application and that the employment agreement with Plaintiff Watkins was reasonable. *Id.* at 199-200. UNA therefore bears the burden of showing that (1) Watkins worked and slept on the premises for an extended period of time; (2) there was an agreement that he would not be compensated for sleep time; and (3) that agreement was reasonable. The Defendant has carried such burden.

As this Court noted in *Clayton*, the Fourth Circuit has not specifically addressed what constitutes "extended periods of time" under 29 C.F.R. § 785.23, and there is a split of authority among other circuits. 447 F. Supp. 3d at 416 (citing *Beaston v. Scotland School for Veterans' Children*, 693 F. Supp. 234 (M.D. Pa. 1988), *aff'd*, 869 F.2d 587 (3d Cir. 1989); *Giguere v. Port Resources Inc.*, 927 F.3d 43 (1st Cir. 2019)). In *Beaston*, the employees worked at a residential school for seven-day shifts that began at 3:00 p.m. on a Friday and ended at 8:30 a.m. the following Friday. 693 F. Supp. at 235. The United States Court of Appeals for the Third Circuit affirmed the district court's finding that because the employees "spend seven consecutive days and nights on campus, they reside there for an extended period of time." *Id.* at 239.

Meanwhile, in *Giguere*, the plaintiffs similarly worked seven days on, seven days off from Thursday through Thursday, while their employer's workweek was Sunday through Sunday. 927 F.3d at 46. However, the United States Court of Appeals for the First Circuit

affirmed the District Court's finding that the employer had *not* met the "extended periods of time" requirement under 29 C.F.R. § 785.23 based on a 1988 Department of Labor Enforcement Policy ("1988 DOL Policy"). *Id.* (citing U.S. Dep't of Labor, Wage & Hour Div., Enforcement Policy, 2018 WL 614199, at *2 (June 30, 1988)). The 1988 DOL Policy "stated that an employee meets the extended-periods-of-time standard when . . . he 'resides on the premises for a period of at least 120 hours in a workweek,'" and "defined workweek' as 'seven consecutive 24-hour periods,' citing 29 C.F.R. § 778.105 . . . which provides that . . . once the employer has established when the workweek begins, the workweek's span 'remains fixed regardless of the schedule of hours worked by [the employee.'" *Id.* at 48. (emphasis in original). The Court explained that because the employer had established a workweek of Sunday to Sunday, and the employees worked Thursday to Thursday, the employees could not be found to have resided on the employers' premises for "extended periods of time," as contemplated by 29 C.F.R. § 785.23. *Id.* at 49-50.

In *Clayton*, this Court noted that it was not persuaded by the First Circuit's understanding of "extended periods of time":

> While the First Circuit noted that the 1988 DOL Policy has not been superseded and is still used by the DOL, there is additional guidance by the DOL that suggests that "extended periods of time" is not defined by the employer's workweek under 29 C.F.R. § 778.105. (*See, e.g.*, U.S. Dep't of Labor, Wage & Hour Div., Administrator's Interpretation No. 2014-1 (Mar. 27, 2014), 2014 WL 1276986; Dep't of Labor, *Exclusion of Sleep Time from Hours Worked by Domestic Service Employees* (Apr. 25, 2016).) For example, in a 2014 Opinion Letter, the DOL defined "extended periods of time" as "to work and sleep there for five days a week (120 hours or more) or five consecutive days or nights (regardless of the total number of hours," without reference to the employer's workweek or 29 C.F.R. § 778.105. 2014 WL 1276986 at *9, *12 n.22. Similarly, in a 2016 DOL Field Assistance Bulletin, "extended periods of time" was defined as "work[ing] and sleep[ing] there for five days a week (120 hours or more) or five consecutive days or nights (regardless of the total number of hours)," without

reference to an employer's workweek or 29 C.F.R. § 778.105. Dep't of Labor, *Exclusion of Sleep Time from Hours Worked by Domestic Service Employees* (Apr. 25, 2016) at 2-3. This varying guidance shows that the DOL has not clearly established what constitutes the requisite period of time to determine whether employees reside on their employer's premises for "extended periods of time."

*Clayton*, 447 F. Supp. 3d at 417. Neither the Fourth Circuit nor the Department of Labor have adopted the First Circuit's interpretation of "extended periods of time."

Using the definition for "extended periods of time" as elaborated in the 2014 Opinion Letter and 2016 Field Assistance Bulletin, Watkins' time at the Coulbourn Mill facility each week plainly falls within the "extended periods of time" description. The question is then whether there was an agreement between UNA and Watkins that he would not be compensated for sleep time and whether such agreement was reasonable. As noted above, Defendant UNA did produce in discovery a document purported to detail the organization's sleep policy. (ECF No. 27.) However, given discovery has not produced a copy of this policy signed by Plaintiff Watkins, this Court will proceed to analyze the issue as if there was no written agreement related to sleep policies between the parties.

The Defendant UNA contends that agreements to exempt sleep time from paid work under the FLSA may be implied and are not required to be in writing. (ECF No. 24-1 at 19 (citing *Braziel v. Tobosa Dev. Servs.*, 166 F.3d 1061, 1063 (10th Cir. 1999)).) As UNA asserts, "'an implied agreement to deduct sleep time from employee's compensation clearly exists if an affected employee does not assert any verbal or written protest to the arrangement within a reasonable period of time of adoption of the policy or employee being hired under the policy.'" (*Id.* (citing *Sidell v. Residential CRF, Inc.*, No. 1:08-CV-1699-SEB-DML, 2010 WL 4723722, at *6 (S.D. Ind. Nov. 12, 2010) (internal citation omitted)).) The Plaintiff does not

contend that UNA was required to supply Watkins with a formal, written agreement in this case. Instead, the Plaintiff contends that the terms of whatever agreement there was between the parties were ambiguous. (ECF No. 25 at 30-32.)

Nevertheless, the Plaintiff clearly testified that he was aware his "job description" involved staying on the Coulbourn Mills facility overnight. (ECF No. 24-2 at 64:3-15.) The Complaint also specifically states that he was "advised" he would not be paid for the overnight hours at the facility. (ECF No. 1 ¶ 11.) Watkins did not object to Thorpe's testimony that he could receive overtime pay for any hours he did in fact work during the overnight period. (ECF No. 25.) Finally, Watkins also admits that until filing his claim with the DLLR after he left UNA in May 2019, Watkins made no complaints to UNA about his lack of payment during the overnight hours. (ECF No. 24-2 at 30:2-6, 33:14-17.) Even if Watkins' conversation with his friend and supervisor Thorpe in April of 2019 could possibly be construed as a complaint regarding his pay, Watkins still worked for more than two years without ever mentioning to management he was dissatisfied with his lack of overnight pay. There was an agreement between UNA and Watkins with respect to overnight pay. That agreement was also reasonable. *See, e.g.*, *Hendricks v. Oklahoma Prod. Ctr. Grp. Homes.* 159 Fed. App'x 875, 878 (10th Cir. Dec. 21, 2005) (holding sleep time agreement was reasonable where "plaintiffs were provided adequate sleeping facilities, and plaintiffs were paid for interruptions in their sleep"); *Ormsby v. C.O.F. Training Servs., Inc.*, 194 F. Supp. 2d 1117, 1189 (D. Kan. 2002) (entering summary judgment in favor of non-profit residential group home defendant where plaintiff acquiesced to a policy requiring him to stay on the premises for seven and a half hours overnight for sleep time without pay); *Galloway v. George Junior Republic*, No. 12-1399, 2013 WL

5307584, at *15 (W.D. Penn. Sept. 19, 2013) (entering summary judgment in favor of the defendant in case resembling the "vast majority" of cases in which courts have decided in favor of defendant employers where employees regularly obtained at least five hours of sleep, the employer allowed them to submit requests for overtime if they documented that their sleep was interrupted, and they did not complaint about sleeping facilities).

The same reasoning can be applied to the North Carolina trip. Although Watkins may not have been aware of how he would be compensated for his work on the trip prior to departure, upon his arrival he was clearly notified via a written document that he would be receiving forty hours of pay plus benefits such as lodging, meals, activities, and other amenities. (ECF No. 25-4.) Watkins signed the form without asking any questions or raising any concerns. (ECF No. 24-2 at 45:17-47:6.) During the trip, Watkins did in fact participate in the group activities including shopping, shooting pool, and playing games. (*Id.* at 40:2-13.) Watkins was also provided meals. (*Id.* at 44:19-45:1.) He shared a room with Louis, but after Louis went to sleep, he was free to watch movies, play pool and ping-pong, and other activities. (*Id.* at 40:14-42:4.) This Court is satisfied that there was a clear agreement between the parties, that Watkins consented to that agreement, and that such agreement was reasonable.

## II.     Plaintiff's State Law Claims – Counts Two and Three

Just as in *Clayton*, the Plaintiff's state law claims in this case under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. § 3-401, *et seq.* ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* ("MWPCL") fail for the same reasons as his claims under the FLSA. 447 F. Supp. 3d at 418. The Maryland Court of Special Appeals has explained that "[b]ecause the [MWHL] is the counterpart to the

Fair Labor Standards Act, the federal regulation is, therefore, persuasive authority as to the correct interpretation of Maryland law." *Poe v. IESI MD Corp.*, 220 A.3d 333, 338-39 (Md. Ct. Spec. App. Nov. 20, 2019). The Maryland Court of Special Appeals has also held that there is "no basis in the language of the Maryland statutes or regulations to conclude that Maryland law prohibits employees from relying on the federal regulation" in the specific context of determining any overtime pay owed. *Id.* at 339. Both the FLSA and Maryland law distinguish between time "engaged to be waiting," which is compensable, and "waiting to be engaged," which is not. *See Marroquin*, 505 F. Supp. 2d at 295. This Court can simply not conclude "that the definition of on-call time under the MWHL and the MWPCL is any broader or more generous than on-call time under the FLSA." *Clayton*, 447 F. Supp. 3d at 418. Accordingly, for the reasons detailed above, as the Plaintiff's time was not compensable under the FLSA because it was time spent "waiting to be engaged" or, alternatively, "sleep time," so too was that time not compensable under the MWHL and the MWPCL.

## CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment (ECF No. 24) is GRANTED. Judgment shall be entered in favor of the Defendant United Needs & Abilities, Inc.

A separate Order follows.

Dated: July 12, 2021

_____/s/_____
Richard D. Bennet
United States District Judge